# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 08/27/2019 11:31 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Clifton,Deputy Clerk

Case 2:19-cv-07682-SVW-FFM   Document 1-1   Filed 09/05/19   Page 2 of 51   Page ID #:7

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Christopher Lui

AARON G. FILLER, Esq. SBN 302956
CHANEL KATIRAIE, Esq. SBN 315825
ALEX R. STRAUS, Esq. Cal SBN 321366,
            (NY SBN 5175419)

Tensor Law, P.C.
2716 Ocean Park Blvd, #3082
Santa Monica, California 90405
Tel: (310) 450-9689
Fax:  (310) 496-3176

Attorneys for Plaintiff
 Paz De La Huerta

### SUPERIOR COURT OF THE STATE OF CALIFORNIA
### COUNTY OF LOS ANGELES – CENTRAL DISTRICT

PAZ DE LA HUERTA,

           Plaintiff,

      vs.

HARVEY WEINSTEIN, an individual; and
ROBERT WEINSTEIN, in his capacity as
an officer and director of Miramax and of
The Weinstein Company, LLC and of
Miramax; MIRAMAX FILM NY LLC;
THE WALT DISNEY COMPANY;
MICHAEL D.  EISNER, in his capacity as
an officer and Director of The Walt Disney
Company; ROBERT A. IGER, in his
capacity as an officer and Director of The
Walt Disney Company; FOUR SEASONS
HOTELS, LTD, a Canadian Corporation;
BURTON WAY HOTELS, LTD, a
California Limited Partnership; BURTON
WAY HOTELS LLC, a Delaware LLC; and
DOES 1 to 25, inclusive,

          Defendants.

Case No.

Assigned for all purposes to:

**COMPLAINT FOR:**

1. **ASSAULT**
2. **SEXUAL BATTERY IN VIOLATION OF CALFORNIA CIVIL CODE §1708.5 (RAPE)**
3. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
4. **NEGLIGENT SUPERVISION**
5. **PREMISES NEGLIGENCE**
6. **SEX TRAFFICKING IN VIOLATION OF 18 U.S.C.§1591 (TVPA)**

**JURY TRIAL DEMANDED**

Action Filed: August 27, 2019

Hearing:
    Date:
    Time:
    Location:

-1-

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................... 2

II. JURISDICTION AND VENUE ............................................................................... 3

III. FACTUAL ALLEGATIONS ................................................................................. 6
    1) Events Prior to 2010 ............................................................................................. 6
    2) Continued Interest by Harvey Weinstein in Reference to Cider House Rules ....................... 12
    3) First Assault on December 7, 2010 ........................................................................... 12
    4) Corroboration of First Assault .................................................................................. 14
    5) Second assault on December 23, 2010 ........................................................................ 16
    6) Events at the Four Seasons Hotel Los Angeles in Beverly Hills January 14 and 15, 2011 ............ 16
    7) Culpability of Burton Way and Four Seasons LTD .............................................................. 19
    8) Retaliatory Career Destruction Undertaken by Weinstein for De La Huerta's Accusations and
    Rejections and Equitable Estoppel of Assertion of the Statute of Limitations and Continuing
    Wrong ................................................................................................................. 25
    9) Endorsement and Ratification by The Weinstein Company ................................................ 28
    10) Further Contemporaneous Corroboration ................................................................... 29
    11)  Interview in 2014 Disclosing Rapes and Four Seasons Events Wherein Plaintiff Was Too
    Fearful to File a Complaint ........................................................................................ 29
    12). Culpability of Weinstein Director Robert Weinstein .......................................................... 30
    13) Multiple United States District Court Judges Have Recently Ruled that the Trafficking Victims
    Protection Act is Applicable to Weinstein's Actions ............................................................. 32
    14) Respondeat Superior Establishes Liability for Disney and Miramax for the Assaults and for the
    Subsequent Alleged Actions of Harvey Weinstein to Cause De La Huerta's Employers at HBO and
    Lionsgate to Terminate Her Employment ....................................................................... 33

IV. FIRST CAUSE OF ACTION - ASSAULT ........................................................... 34

V. SECOND CAUSE OF ACTION – SEXUAL BATTERY ..................................... 35

VI. THIRD CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS .............. 37

VII. FOURTH CAUSE OF ACTION – NEGLIGENT SUPERVISION ................... 38

VIII. FIFTH CAUSE OF ACTION – PREMISES LIABILITY NEGLIGENCE ............................ 41

SIXTH CAUSE OF ACTION  COUNT I - VIOLATION OF 18 U.S.C. §1591 ............... 42

SIXTH CAUSE OF ACTION  COUNT II - PARTICIPATING IN A VENTURE IN VIOLATION OF 18
U.S.C. §1591 ........................................................................................................ 44

IX. DAMAGES ............................................................................................................. 46

X. CONCLUSION ........................................................................................................ 46

XI. PRAYER FOR RELIEF ........................................................................................ 46

# I. INTRODUCTION

Now comes Plaintiff, Paz De La Huerta, who files this civil complaint against HARVEY

WEINSTEIN, ROBERT WEINSTEIN, MICHAEL D. EISNER, ROBERT A. IGER,

PAZ DE LA HUERTA'S COMPLAINT FOR SEX TRAFFICKING ASSAULT AND NEGLIGENCE vs WEINSTEIN ET AL

MIRAMAX, THE WALT DISNEY COMPANY and also against BURTON WAY LTD,

BURTON WAY LLC, and FOUR SEASONS HOTELS LTD.

## **II. JURISDICTION AND VENUE**

1.      Plaintiff, Paz De La Huerta (hereinafter referred to as Plaintiff) is and at all times mentioned herein was, an individual, over the age of majority, residing in the City of Los Angeles, County of Los Angeles, State of California and in the City of New York, County of New York, State of New York.

2.      Defendant Harvey Weinstein (hereinafter "Weinstein"), upon information and belief, is now, and at all times mentioned herein was, an individual, over the age of majority, residing in the City of Los Angeles, County of Los Angeles, State of California and in the City of New York, County of New York, State of New York who has engaged in the buying and selling of property in California at least at 518 North Kilkea Avenue in Beverly Hills, California and who has extensive regular business activities and extensive contacts in the State of California, thereby subjecting him to general jurisdiction in the State of California.

3.      Defendant Robert Weinstein, brother of Defendant Harvey Weinstein is a citizen of the United States and a resident of Greenwich, Connecticut. Robert Weinstein is the former chairman of Miramax and is and was a director of TWC from 2005 to 2017. Robert Weinstein stated during the course of the facts pertinent to this action that he was "divorcing" his brother Harvey Weinstein by moving his business operations to California.

4.      Robert Weinstein is a Director Defendant who knew of Harvey Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Harvey Weinstein and his position as a director of TWC.

5.      By virtue of his position as a board member of TWC, like any Director Defendants Robert Weinstein availed himself of the laws of New York and is subject to jurisdiction in New York. Robert Weinstein chose to focus his professional activities as a TWC Director into California as a gesture at "divorcing" his brother. This was substantially because of his knowledge of Harvey's Weinstein sexual misbehavior. By his participation in directing a

-3-

company with substantial business activities and second headquarters in California having availed himself of California, Robert Weinstein subjected himself to personal jurisdiction in California.

6.     Defendant Miramax Film NY, LLC is a New York corporation with its principal place of business in Santa Monica, California (hereinafter "MIRAMAX"). In 2010, Miramax Film NY, LLC merged with and assumed all liabilities of Miramax Film Corp., which was the Miramax entity that employed Harvey Weinstein or for which Harvey Weinstein acted as an officer or director. Miramax Film Corp. was a subsidiary of The Walt Disney Company.

7.     Defendant The Walt Disney Company (hereinafter "Walt Disney") is a Delaware corporation with its principal place of business located in Burbank, California. Miramax Film Corp was a subsidiary of The Walt Disney Company which controlled the budget for Miramax. Walt Disney audited Miramax's financial data and also approved and paid the business expenses of Miramax.

8.     Defendant Michael D. Eisner is a resident of Bel Air, California and a citizen of the United States. Eisner was Chairman and CEO of Walt Disney from 1984-2005.  Between the acquisition of Miramax in 1993 and the separation of Harvey Weinstein and Robert Weinstein from their positions as executives of Miramax in 2005, Eisner made a series of decisions that allowed a range of actions by Harvey Weinstein that unacceptably harmed certain employees of Miramax.

9.     Defendant Robert A. Iger has served as President and Chief Operating Officer of The Walt Disney Company from 2000 to present and has served as Chief Executive Officer of The Walt Disney Company from 2005 to present. Iger made a series of decisions that allowed a range of actions by Harvey Weinstein that unacceptably harmed certain employees of Miramax Following the departure of Harvey Weinstein and Robert Weinstein from their positions as executives of Miramax in 2005, Iger made no effort to identify or remediate harms by Harvey Weinstein to current or former employees of Disney-Miramax.

10.    Defendant BURTON WAY HOTELS, LTD, is a California Limited Partnership of which Robert Cohen is the General Partner and BURTON WAY HOTELS LLC is a Delaware

-4-

Limited Liability Corporation (hereinafter collectively "Burton Way"). Both entities have registered offices at 2029 Century Park East, #2200, Los Angeles California, 90067 and have roles as owners of a hotel at 300 South Doheny Drive, Beverly Hills, California, 90048 which is named THE FOUR SEASONS LOS ANGELES AT BEVERLY HILLS (hereinafter "FOUR SEASONS BEVERLY HILLS") and which is managed by the Four Seasons Hotels, LTD, doing business as the Four Seasons Hotels and Resorts, a Canadian Corporation, headquartered at 1165 Leslie Street, Toronto, Ontario, Canada, M3C 2K8 (hereinafter "FOUR SEASONS LTD").

11.     One of the events giving rise to this complaint took place in Los Angeles, California in this Central District at 300 South Doheny Drive, Beverly Hills, California (Four Seasons Los Angeles at Beverly Hills). Venue is therefore proper in this court. This court is the proper court for trial in this action in that the actions and omissions of Defendants as alleged herein where made within this Court's jurisdictional area. Venue properly lies in this county in that both Defendants regularly conduct business in this county, and one of the torts described herein was committed in this county.

12.     Plaintiff is unaware of the true names or capacities, whether they are individuals or business entities, of Defendant DOES 1 through 50, and therefore sues them by such fictitious names and will seek leave of this Court to insert true names and capacities once they have been ascertained.

13.     At all times mentioned herein, Defendants, and each of them, inclusive of DOES 1 through 50, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Upon information and belief, all Defendants are responsible in some manner for the events described herein and are liable to Plaintiff for the damages they have incurred.

14.     The Harvey Weinstein Company, LLC (hereinafter "TWC") has offices at 9100 Wilshire Blvd, Beverly Hills, California and also at 375 Greenwich Avenue, New York, NY. It is registered with the Secretary of State, in the State of California under registration number:

#200513810010, having extensive regular business and extensive contacts in the State of California and is therefore subject to general jurisdiction in the State of California. This entity is now bankrupt (see 18:-1061-MFW, District of Delaware) and has been dismissed from a predecessor action 18STCV04723/2:19-cv-02183 *De La Huerta v. Weinstein*, et al.

## III. FACTUAL ALLEGATIONS

*1) Events Prior to 2010*

15.    Plaintiff alleges that in 1990 Miramax relocated its offices to Robert De Niro's Tribeca Film Center at 375 Greenwich St. in the Tribeca section of Manhattan. Shortly thereafter, Miramax leased apartment 3B at 311 Greenwich St. The Landlord for the lease was a parent of two young children – one of whom was Paz De La Huerta, then six years old, who had her bedroom in apartment 3C at 311 Greenwich St on the other side of a wall from the Miramax apartment.

16.    This was around the time of Miramax's iconic release of Steven Soderbergh's "Sex, Lies, Videotape" about a character who can only achieve sexual gratification through watching videotapes. Miramax maintained the lease through late 1994 when the landlord – Paz De La Huerta's mother, terminated the lease after a series of complaints to Miramax of a number of incidents of loud partying and other acts of public nuisance incompatible with its location adjacent to the family's apartment.

17.    Paz De La Huerta was born in 1984 so that at least from age 6 through 10, she was a neighbor to Miramax and witness as a child to disputes between her family and Miramax as well as being continually exposed to the sounds. In addition, from routine daily encounters in the hallway outside the apartment and in the streets in front of the apartment, Paz De La Huerta became acquainted with Miramax staff and executives.

18.    In 1998, Billy Hopkins, a casting director for Miramax, approached Paz De La Huerta and her mother on the street in front of the apartment and asked Paz to play the role of a 14-year-old girl in a full-length Miramax motion picture to be filmed in Vermont, Massachusetts and Maine during the following year – Cider House Rules.

19.    Miramax selected their next-door neighbor – 13-year-old Paz De La Huerta - to star in Cider House Rules, so it is indisputable that senior executives at Miramax – almost certainly Harvey Weinstein – were well aware of Paz.  Although it is true that casting director Billy Hopkins actually approached Paz and Judith on the street near 311 Greenwich – here, selection out this next-door neighbor out of all the teenagers in New York was not likely a mere co-incidence.

PAZ DE LA HUERTA'S COMPLAINT FOR SEX TRAFFICKING ASSAULT AND NEGLIGENCE vs WEINSTEIN ET AL

Figure 1 – In Cider House Rules starting around minute 21 in the film, Paz (Mary Agnes) flirts with soldiers on a train, Homer (Tobey Maguire) is talking to an orphan boy about his fantasy of killing his parents, but Homer is distracted by watching Paz's legs as she flirts. One of the soldiers reaches for Mary Agnes, she slaps him, spits at him and fumes. Later in the film, she prims and primps to get Homer's attention.

20.     Immediately following the film shoot, several actors commenced telling Paz how sexy she looked in the scene. She looked up and saw Harvey Weinstein staring at her as he sat on the back of a truck and stared at her. When Weinstein saw that Paz had noticed his stare, he beckoned her over, introduced himself, and asked her to sit next to him, upon which he put his arm around her and told her he would make her a famous actress.

21.     Plaintiff alleges that Defendant Harvey Weinstein developed an immoral and unwholesome interest in her sexually when she was 14 years of age and that she experienced disturbing, and sexual interest from him commencing at that time in 1999 and continuing through at least 2011.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



*The Lipstick*, Paz de la Huerta, ph. Tina Barney, 1999

Figure 2 - Archival photo portrait by Tina Barney from 1999, shows Paz De La Huerta, age 14, in front of the mirror in her bedroom at 311 Greenwich, Apartment 3C.  The door to her left leads into Apartment 3B which had been the Miramax office. The door was cut in the wall after Miramax vacated the space, in order to join 3B to 3C for another family member. Eleven years later, - after the door was sealed up again - Harvey Weinstein raped Paz De La Huerta twice in apartment 3C.

22.    Miramax under Disney did rent this apartment within 1,000 feet of its 375 Greenwich St, New York, NY headquarters, under full decisional control of its directors and officers and owners – which apartment was used significantly for the illicit sexual activities of Harvey Weinstein. These quarters were offered instead of a hotel for young actresses seeking to do business with Miramax and Disney-Miramax, and on information and belief, certain female employees of Miramax. Among these was an apartment rental at 311 Greenwich.

27
28

-10-
PAZ DE LA HUERTA'S COMPLAINT FOR SEX TRAFFICKING ASSAULT AND NEGLIGENCE vs WEINSTEIN ET AL

23.     The directors of Miramax and Disney-Miramax had full knowledge of this rental and full knowledge of the purpose of this apartment rental. Of note, there existed throughout this period of time a Sheraton Hotel, a Hilton Hotel and the Soho Grande Hotel also within 1,000 feet of said headquarters. Therefore, the Directors of Miramax and later Disney-Miramax were fully appraised of continuing material expenditures of the company – paying rent to De La Huerta's unsuspecting family -  undertaken purely for the purpose of shielding and protecting and promoting the predatory sexual behavior of Harvey Weinstein. The Directors and Officers of Miramax, such as Robert Weinstein, had a duty to warn De La Huerta's family. Paz De La Huerta was a victim of Harvey Weinstein, of Miramax and of Disney-Miramax and their Directors through her exposure to this activity during her childhood – a fact that further magnified the emotional distress she suffered once the 2010 rapes occurred adjacent to the space previously leased by Miramax.



Figure 3 – Apartment C at 311 Greenwich (A) looking east, the red arrow indicates the mirror seen in the Tina Barney photo at Figure 2. (B) view to west towards entry door from hallway and sled bed where sexual assaults occurred. Photos by NYPD Detective Nicholas DiGaudio.

*2) Continued Interest by Harvey Weinstein in Reference to Cider House Rules*

24.     Paz De La Huerta moved out the Tribeca apartment to live with a boyfriend in 2005 (Troy Garity – son of Tom Hayden and Jane Fonda). She recalls that Harvey Weinstein approached her and Garity at a party at Sunset Tower Hotel in Los Angeles in 2005. He scanned up and down along her dress and stated:

"My how my Mary Agnes has grown up, what a beautiful woman she's grown up into."

25.     Five years later, in May of 2010, Paz De La Huerta moved back into 3C at 311 Greenwich. By this time, De La Huerta had developed post-traumatic stress disorder (PTSD) in relation to Harvey Weinstein. She commenced therapy when she moved back into Apartment 3C and repeated a daily mantra to combat the PTSD: "I have nothing to fear from Harvey Weinstein."

26.     She had been hired by HBO and Martin Scorsese for "Boardwalk Empire" in which role she performed in 24 episodes, earning considerable acclaim as an actress, wide public recognition and a very favorable reception by viewers of the series.  She was also hired by Lionsgate to be the lead actress in what was anticipated to be a series of "film noire" style action adventures – the first of these "Nurse 3D" was filmed in 2011, with her performance being well received by many reviewers. Both of these ongoing high-profile acting jobs – HBO and Lionsgate - were terminated in 2012 without specific explanation to her as to what had gone wrong.

*3) First Assault on December 7, 2010*

27.     Plaintiff is informed and believes, and upon such information and belief states that on or around December 7, 2010 De La Huerta encountered WEINSTEIN at a lounge called "Top of the Standard" (aka Boom Boom Room) on the High Line located in Manhattan, New York, because both were attending a party at that location celebrating the opening of a movie called Blue Valentine. De La Huerta and WEINSTEIN were neighbors who did recognize each

1  other occasionally – as at grocery stores or cafes as well as having a prior employee/employer

2  relationship from 1999.




Figure 4 – Photos of WEINSTEIN and De La Huerta at Blue Valentine afterparty December 7, 2010.

28.     WEINSTEIN offered De La Huerta a ride home to Tribeca which De La Huerta

agreed to. On the way to De La Huerta's home, WEINSTEIN continuously pressured De La

Huerta to have a drink with him, stating that he wanted to discuss an acting part for her in a

future production. Upon reaching De La Huerta's home, WEINSTEIN insisted on coming up to

De La Huerta's apartment to avoid discussing business and personal matters in the public lobby

of De La Huerta's apartment building. Once inside of De La Huerta's apartment, WEINSTEIN

made warnings to De La Huerta about harm to her career if she did not submit to sex, then

forced himself on De La Huerta and raped De La Huerta, thus – on information and belief –

acting out a fantasy and obsession he had long nurtured engaging in sexual activities in an

apartment next door to De La Huerta's childhood bedroom and through years of obsession with

De La Huerta following on her acting performance in Cider House Rules. Defendant Harvey Weinstein then taunted Plaintiff by relaying that he would be calling her.

29.     Plaintiff alleges that Defendant Weinstein or an employee of TWC would then call Plaintiff's cellphone at least several times over the following two weeks. Defendant Weinstein or the TWC employee would tell Plaintiff that he was waiting outside of her apartment building in his vehicle or in the lobby of the building waiting for her, stating that he wanted to discuss a part in a production he had in mind for her. Plaintiff would avoid his calls, and avoid returning to her home until she was notified that he had left the premises. Defendant continued this behavior through the two weeks after raping Plaintiff.

*4) Corroboration of First Assault*

30.     On information and belief as well as according to news reports, WEINSTEIN had a protective program for his assaults which included seeking to have a photograph taken with his prior victim, following any assault. When the October 5, 2017 report in the New York Times by Jodi Kantor & Megan Twohey caused a furore about the assaults, WEINSTEIN purportedly produced a number of such photographs to the board of directors of THE WEINSTEIN COMPANY for the purpose of showing that these photographs would derail any criminal or civil action against him. WEINSTEIN procured such a photograph with De La Huerta, one week after the first rape:

-14-

PAZ DE LA HUERTA'S COMPLAINT FOR SEX TRAFFICKING ASSAULT AND NEGLIGENCE vs WEINSTEIN ET AL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19  Figure 5 – Photo of WEINSTEIN with De La Huerta on December 13, 2010

20      31.    Tensor Law PC ("TLPC") located and presented the December 7th, 2010

21  photographs to the NYPD to show the date of the first assault and to prove the veracity of De La

22  Huerta's statements to the NYPD. TLPC located and presented the December 13th, 2010 photo

23  to the NYPD to prove that WEINSTEIN had developed a direct interaction with WEINSTEIN.

24  Further TLPC asserted that in the light of the revelation of WEINSTEIN's defensive modus

25  operandi (obtaining public, post-assault photographs for defensive purposes), this provided

26  prima facie evidence of an active cover-up by WEINSTEIN tending to prove an assault from

27  which he believed he would need a defense. The December 13th photos are the only time these

28  two persons have been photographed together.

-15-

*5) Second assault on December 23, 2010*

32.      Plaintiff is informed and believes, and upon such information and belief states that shortly thereafter, on or around December 23, 2010, Plaintiff received a phone call from Weinstein while she was at work doing a professional photoshoot with Mark Squires wherein Weinstein again stated that he was waiting outside her building and would remain until she got home. Plaintiff again decided to confront Weinstein to point out that she viewed this as stalking and that he was to leave her alone. However, during the ride home, Plaintiff consumed a very large quantity of alcohol out of fear and depression, thereby rendering herself unable to consent to any disputed sexual encounter.

33.      Plaintiff, by then barely able to stand, did confront Weinstein, again waiting at the lobby of her home when she returned home. Plaintiff told Weinstein to leave, to which Weinstein "hushed" her and insisted that they speak in a private place, promising that they would be able to resolve this discussion in her apartment. On information and belief, at least one witness has come forward who observed them arguing outside her apartment door. Weinstein then forcibly entered the apartment without consent and again forced himself on Plaintiff by performing unconsented vaginal intercourse through overpowering physical force. Weinstein stated again that he had in mind an acting part for her in a production. Weinstein left immediately after he raped Plaintiff, leaving Plaintiff in a state of absolute shock, humiliation, embarrassment, and pain, as well as losing consciousness because of progressive absorption of the ingested alcohol. Following this confrontation and attack, however, Weinstein ceased all direct contacts, personal calls, and calls by his office staff directed at Plaintiff as well as ceasing all uninvited visits to her building, but both knew the Los Angeles Awards Season involving both of them in California two weeks later was in immediate prospect which would prevent Plaintiff from avoidance of coming into the presence of Harvey Weinstein again very soon.

*6) Events at the Four Seasons Hotel Los Angeles in Beverly Hills January 14 and 15, 2011*

34.      Plaintiff believes and therefore alleges that in relation to the 11th Annual American Film Institute 2010 Awards luncheon, held on January 14, 2011 in the driveway of the Four

-16-

Seasons Hotel in Beverly Hills, just two days before the 68th Golden Globe Awards on January 16, 2011 (to be held at the Beverly Hilton), Harvey Weinstein occupied a room at the Four Seasons Hotel on South Doheny Drive in Beverly Hills. The AFI Awards named De La Huerta's show "Boardwalk Empire" as one of the "Programs of the Year" and gave a "Special Award" to The Weinstein Company's "The King's Speech." Thus, this critical business and professional event coincidence brought De La Huerta and Weinstein back into proximity with each other three weeks after the second rape.

35.    On the afternoon of January 15, 2011 Harvey Weinstein attended the annual British Academy of Television Arts (BAFTA) Los Angeles Awards Season 17th Annual Tea at the Four Seasons Hotel Los Angeles at Beverly Hills. This was part of the annual three-day sequence of AFI on the first day, BAFTA on the second day and Golden Globes on the third day which brought Harvey Weinstein to the Four Seasons annually. Of note, The Four Seasons is a registered Creditor of The Weinstein Company in the pending Bankruptcy proceeding in United States District Court of the District of Delaware 18-10601-MFW.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



BAFTA Los Angeles Awards Season Tea In Association With The Four Seasons And Bombay Sapphire - Inside
LOS ANGELES, CA - JANUARY 15: Songwriter Diane Warren and producer Harvey Weinstein attend the BAFTA Los Angeles Awards Season Tea in Association with The Four Seasons and Bombay Sapphire at the Four Seasons Hotel Los Angeles on January 15, 2011 in Los Angeles, California. (Photo by Frazer Harrison/Getty Images For BAFTA Los Angeles)

17  Figure 6 - Harvey Weinstein at the Four Seasons Los Angeles at Beverly Hills on the afternoon of January 15, 2011

18          36.     On the same afternoon, Paz De La Huerta attended Day 2 of the Annual In Style

19  Golden Globes Beauty Lounge at the Four Seasons Los Angeles at Beverly Hills on January 15,

20  2011.

21
22
23
24
25
26
27
28

-18-

InStyle Beauty Lounge - Day 2
Paz de la Huerta and Aimee Teegarden attend InStyle Beauty Lounge - Day 2 at the Four Seasons Hotel Los Angeles on January 15, 2011 in Los Angeles, California. (Photo by Stefanie Keenan/WireImage)

Figure 7 – Paz De La Huerta with actress Aimee Teegarden at the Four Seasons Los Angeles at Beverly Hills on the afternoon of January 15, 2011.

37.     Plaintiff is informed and believes, and upon such information and belief states that on or about the afternoon of January 15, 2011, Weinstein was visiting the Four Seasons Hotel having drinks with several associates in a lobby lounge following the BAFTA event and observed De La Huerta and called her on her cell phone asking her at short distance to come to join him where he was with several other individuals, to discuss their dispute and the acting part he had spoken of in New York.

*7) Culpability of Burton Way and Four Seasons LTD*

38.     Plaintiff notes that the Four Seasons Hotel in Beverly Hills was, at that time, on public notice of recurrent sexual assaults performed by Harvey Weinstein at said Four Seasons Hotel. Famously, on August 7, 2005 at a red-carpet interview at the Comedy Central Roast of Pamela Anderson at Sony Studios in Culver City, Natasha Leggero asked Courtney Love if she

-19-

had any advice for "a young girl moving to Hollywood." Courtney Love answers: "I'll get libeled if I say it…If Harvey Weinstein invites you to a private party at the Four Seasons, don't go." On information and belief, The Four Seasons was fully put on notice by this statement but took no action to warn or protect any young women visitors to the hotel of the risks when any such women visited while Harvey Weinstein was a guest. In fact, in order to promote the business associated with Weinstein's stays at the hotel, the Four Seasons actively assisted Weinstein in his predatory behavior, as it collected large fees from the Weinstein Company.

39.     The Four Seasons Hotel at Los Angeles in Beverly Hills had a generally heightened concern for commercial sexual activity on its premise due to the popularity of "Pretty Woman" in which Richard Gere shares a room with a prostitute at the Four Seasons Beverly Hills on Wilshire Blvd. The Four Seasons actually advertises a three day $100,000 "Pretty Woman" package which is the foremost and shocking promotion of commercial sex in the world. While participants may not engage in commercial sex, this signifies the level of public association and apparent endorsement by the Four Seasons Hotels LTD. The room rate for the Presidential Suite is $10,000 per night, thus the advertising leaves little doubt that Four Seasons charges an additional $70,000 for the "Pretty Woman."

40.     The Four Seasons Los Angeles at Beverly Hills, the owner operators – Burton Way – as well as the Four Seasons LTD were well aware of the prosecution of Anand Jon Alexander (see *People v. Alexander* 2012 WL 2311554). Alexander offered a path to success for aspiring young models, wherein his modus operandi was to invite a young woman to meet him in the lobby of the Four Seasons in Beverly Hills. He used the Four Seasons repeatedly because he understood its reputation would provide an aura of respectability and safety. Following the meeting in the lobby with further promises of advancement in a modeling career, a sexual assault would ensue – see Count A:

A. Jessie B., Counts 7–9: Sexual Battery by Restraint, Attempted Forcible Oral Copulation, Forcible Rape:… When Jessie arrived at the Los Angeles airport on March 4, 2007, she called appellant, who instructed her to take a taxi to the Four Seasons Hotel in Beverly Hills

Alexander at *2

H. Amanda C., Counts 10–11: Sexual Penetration by a Foreign Object, Using a Minor for Sex Acts:… Amanda arrived in Los Angeles on the morning of March 6, 2007. Appellant told her to take a shuttle to the Four Seasons Hotel. Amanda called appellant from the hotel, and appellant met her in the lobby.

Alexander at *6. Investigation of the assaults involved the Four Seasons management in 2008 and would likely be aware of the verdict in 2009 in relation to extensive media coverage.

41.     Additionally, in October of 2010, ABC News drew attention to Hollywood casting couch incidents (Tales from the Casting Couch: Hollywood's Ugly Open Secret, by Coeli Carr, October 12, 2010  - (https://abcnews.go.com/Entertainment/gwyneth-paltrow-lisa-rinna-sexual-politics-casting-couch/story?id=11849706), while other media connected Harvey Weinstein to this pattern of behavior.

42.     Harvey Weinstein was not a "one off" guest staying for one evening with no particular notoriety to even draw the management's attention to his presence. The three-day Awards Season event of AFI film awards, BAFTA tea, and Golden Globes resulted in an annual event in which The Weinstein Company would rent a block of rooms and "hold court" for the independent movie industry. This was an intensive exploitive environment and the management of the Four Seasons had a public duty to discourage commercial trafficking of sex as opposed to promoting it as Four Seasons LTD has continued to do. Plaintiff suffered from Four Seasons LTD's reckless disregard of its duty as a hotelier. The fact that other courts have recently allowed Harvey Weinstein Sex Trafficking cases to proceed in relation to various Four Seasons LTD hotels evidences the corporations willingness to benefit from such activity (see *Canosa v. Ziff et al*,  Amended Complaint 1:19-cv-04115-PAE).

43.     On information and belief, TWC and Harvey Weinstein took measures to conceal illicit activities at the Four Seasons Beverly Hills including the use of a variety of pseudonyms on the hotel registry to avoid public knowledge and knowledge by Weinstein's wife of Harvey Weinstein's rental of a hotel room for illicit mid-day activities at the Four Seasons Hotel Beverly Hills even as he was officially staying at another hotel with his wife.

44.     The Annual Awards season events, taken together with prominent media reporting

-21-

in late 2010 while the management at Four Seasons Los Angeles at Beverly Hills were working

with The Weinstein Company to arrange their Awards Season event, and the ongoing news of

the *People v. Alexander* events, should have put the Four Seasons on heightened awareness,

particularly in light of the specific comments of Courtney Love as to the Four Seasons in

relation to Harvey Weinstein. Thus, when a concierge at the Four Seasons Los Angeles at

Beverly Hills delivered a message to Plaintiff requesting her presence at his suite, that concierge

will have had a very clear knowledge of the types of events likely to transpire, but clearly had

not been advised by his employers to make any sort of warning or offer of a safe escort to

Weinstein's room.

45.     Plaintiff alleges that because Weinstein stated in the call that he was in a public

place with other persons present with him. Therefore, who was angered by the call, reasonably

believed that this would provide a safe opportunity to confront Weinstein. In agreeing to a

meeting with Weinstein, she intended to confront him to demand that he leave her alone and to

call him to account for his assault on her. She believed that after the assault when she tried to

confront him in private at her building in Tribeca, that it would be safer to confront him in the

public, formal, and protective environment of the Four Seasons Hotel where she did not imagine

an attack could be made.

46.     De La Huerta was nearby at the time of receiving the call, walked from her

location at the Four Seasons hotel to the location of Weinstein and his associates in a lobby

lounge area. Plaintiff informed Weinstein that she had subject matter to discuss with him.

Almost immediately, Weinstein excused himself from the group and did not return. Shortly

thereafter, a concierge of Defendant FOUR SEASONS HOTEL gave Plaintiff a note indicating

that it was from Weinstein, requesting her presence in his hotel room for a substantive

discussion. Plaintiff went to Weinstein's room in hopes of accomplishing her intention of

warning and confronting Weinstein to stop the harassing phone calls, which he had that day

resumed,  and any further uninvited visits to her building. Plaintiff alleges that Weinstein

opened the door, wearing an opened bathrobe thereby prominently exposing his penis to

Plaintiff in a taunting manner. Plaintiff also observed another woman undressed in the room and

1   was then invited by Weinstein to participate in a three-party sexual encounter. Plaintiff told

2   Defendant Weinstein to stop stalking and harassing her and quickly left the vicinity of

3   Weinstein's room feeling embarrassed, scared, shocked and humiliated. She noted that

4   Weinstein appeared angered by her rejection and denunciation.

5       47.     The Golden Globe Awards then took place the following day, commencing at 5:00

6   pm on January 16, 2011, at the Beverly Hilton Hotel. During that event De La Huerta's HBO

7   show – Boardwalk Empire won "Best TV Series – Drama" and in which the lead actor in

8   Boardwalk Empire Steven Buscemi won "Best Performance by an Actor in a Television Series -

9   Drama" and in which Kelly Macdonald was nominated for Best Performance by an Actress in a

10  Supporting Role in a Series" and wherein The Weinstein Company's Kings Speech won seven

11  awards. This was an extremely important professional event which De La Huerta attended. It

12  was immediately followed by the Relativity Media and The Weinstein Company 2011 Golden

13  Globes After Party which was attended by De La Huerta along with other Boardwalk Empire

14  cast members and also attended by Harvey Weinstein with his wife Georgina Chapman.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAZ DE LA HUERTA'S COMPLAINT FOR SEX TRAFFICKING ASSAULT AND NEGLIGENCE vs WEINSTEIN ET AL

Figure 8 - Plaintiff De La Huerta and Defendant Harvey Weinstein at the Relativity Media and The Weinstein Company 2011 Golden Globes After Party January 16, 2011.

48.     During this party, in the small confines of the Beverly Hilton party, faced with seeing Weinstein with his wife after being raped twice by him and suffering a humiliating exposure of his genitals at the Four Seasons, hotel, De La Huerta experienced severe emotional distress and commenced drinking very heavily. She left the afterparties at the Beverly Hilton and attempted to attend an afterparty sponsored by GQ at the Chateau Marmont. She was refused admittance and was filmed staggering and falling due to extreme inebriation. This video

-24-

was widely distributed in numerous online media on January 17, 2011 causing additional distress. CBS News reported the video:

> After the ceremony, the 26-year-old star of HBO's "Boardwalk Empire" got so wasted she was rejected from a "GQ" party at Chateau Marmont, then proceeded to hit the deck, rip her dress.

CBS News, January 17, 2011. This a modern token of the humiliation and shame that may be heaped onto a woman raped by a powerful person, who is also shamed into not making any accusation, - here converting from the Plaintiff what should have been a pinnacle day in her acting career turning it instead into an emotionally crushing experience. Other media similarly featured the video.

*8) Retaliatory Career Destruction Undertaken by Weinstein for De La Huerta's Accusations and Rejections and Equitable Estoppel of Assertion of the Statute of Limitations and Continuing Wrong*

49.     At the time of the attacks, Plaintiff was in the second season of filming for Boardwalk Empire and was receiving widespread critical claim and popularity. This work continued through 2011. De La Huerta alleges that the emotional disturbance of the assaults and exposures led to ongoing emotional impacts affecting her behavior.

50.     On information and belief, one year later, Weinstein again attended the AFI Awards Luncheon at the Four Seasons Los Angeles at Beverly Hills the following year, on January 14, 2012, and was possibly reminded of the confrontation with De La Huerta at the Four Seasons the year before. There Weinstein was photographed conversing with Martin Scorsese, Director & Executive Producer of Boardwalk Empire in an image placed prominently in the New York Times. A public announcement of De La Huerta's termination off of Boardwalk Empire was released three weeks later on February 6, 2012. De La Huerta reasonably inferred and herein alleges that the close timing of this meeting of Weinstein with Scorsese occurring just before her termination, led her to reasonably believe that Weinstein was making good on threats to harm her career if she defied him.

-25-

51.     In addition, the "continuing violation" doctrine overrides the statute of limitations. The continuing violation doctrine is an exception to the statute of limitations which allows a plaintiff to bring an action on any one of a series of libelous conduct extending over a period of time because a new cause of action arises in each instance. Thus, the continuing violations doctrine permits a plaintiff to recover for conduct that falls outside the limitations period, as long as part of a "continuing violation" is within the statute of limitations period.

52.     Here, Plaintiff has alleged a series of intimidation, and coercion including threats of harm to her existing career if she revealed the prior acts of sexual domination alleged herein. This intimidation and coercion via threats from DEFENDANT HARVEY WEINSTEIN amount to continuing violations which continued until DEFENDANT HARVEY WEINSTEIN no longer occupied a position to effectuate that intimidation and threats, which continued well within the statutory period for the claims alleged herein.

53.     Of note, following Courtney Love's statement about Weinstein and the Four Seasons in 2005 (see Paragraph 21 above) she stated, in an October 14, 2017 tweet, that she was "banned for life" by her talent agency CAA (Creative Artists Agency) for "speaking out against #HarveyWeinstein #rape," linking this tweet to her 2005 statement connecting Harvey Weinstein, the Four Seasons, and sexual assaults.

1
2

# Traffic Jams With Eastwood and Pitt, Scorsese and Weinstein

3

**BY MELENA RYZIK**   JANUARY 14, 2012 12:48 PM   💬 Comment

4
5
6
7
8
9
10
11
12



13

Fred Prouser/Reuters Martin Scorsese, left, and Harvey Weinstein at the annual AFI luncheon on Friday.

14
15

Figure 9 – Martin Scorsese – Director & Executive Producer of Boardwalk Empire – converses with Harvey Weinstein at the Four Seasons Los Angeles at Beverly Hills on January 14, 2012, three weeks before the public announcement on February 6, 2012 of the abrupt non-renewal of De La Huerta's contract on Boardwalk Empire. New York Times, January 14, 2012.

16

54.     Following the January 2012 event, De La Huerta's contract for additional

17

episodes and seasons of Boardwalk Empire was not renewed, although no reason was ever given

18

by HBO for this discontinuation. On information and belief, Plaintiff here alleges that retaliatory

19

action by Weinstein played a critical role in the termination. Additionally, because Plaintiff

20

reasonably believed this was retaliation, she continued to be fearful of further career harm

21

throughout the film industry, if she proceeded with a lawsuit against Weinstein. She made no

22

further attempts to confront Weinstein and he did not initiate any further telephone contacts to

23

her.

24

55.     Plaintiff alleges that she had feared to press any charges or file any lawsuits

25

against Weinstein and TWC, because of multiple and repeated statements and warnings made

26

by Weinstein to Plaintiff during this five-week period that lack of cooperation on her part with

27

his advances would harm her career. Additionally, Plaintiff was warned by Weinstein that any

28

PAZ DE LA HUERTA'S COMPLAINT FOR SEX TRAFFICKING ASSAULT AND NEGLIGENCE vs WEINSTEIN ET AL

effort to take legal action against him would fail and would prompt him to interfere with her future success and career as an actress. She additionally feared a confrontation with the Four Seasons.

56.     For the reasons set forth in the prior paragraphs, Plaintiff alleges that Defendants Harvey Weinstein, The Weinstein Company, Burton Way and Four Seasons are equitably estopped from asserting the statute of limitations. Unlike an employer where a person can evade future harms by changing employment, Weinstein's pervasive role and impact in the film industry and awards events left no means to escape or terminate the reach of Weinstein's ability to negatively influence her career.  The Four Seasons similarly would defend its reputation from accusation of permitting and fomenting serial sexual assaults on its property with foreknowledge.

*9) Endorsement and Ratification by The Weinstein Company*

57.     Plaintiff is informed and believes, and upon such information and belief states that the criminal and intentional acts performed by Harvey Weinstein were endorsed by the Weinstein Company. The Weinstein Company funded the rooms that Defendant would commit his lewd, forceful and unconsented act, and additionally participated in setting up  meetings between Defendant and Plaintiff, which asserted no business purpose, including attempting to direct her to meet Weinstein at Plaintiff's home.

58.     Plaintiff is informed and believes, and upon such information and belief states that prior to the numerous criminal acts performed by Weinstein, TWC's executives, officers and employees were equipped with actual knowledge of Weinstein's repeated acts of sexual misconduct with women. Further, TWC often aided and abetted Weinstein in the commission of his sexual misconduct. For example, TWC provided that Weinstein's secretary or assistant could and did seek to arrange the "meetings" at Plaintiff's apartment

59.     Plaintiff is informed and believes, and upon such information and belief finds that prior allegations of sexual misconduct involving Weinstein, in which TWC was aware of, were

PAZ DE LA HUERTA'S COMPLAINT FOR SEX TRAFFICKING ASSAULT AND NEGLIGENCE vs WEINSTEIN ET AL

subject to nondisclosure agreements and/or confidential settlements. Therefore, the only knowledge of the full scope of the lewd, criminal acts by Weinstein was held by TWC, Weinstein and the victims of the criminal sexual acts. They were legally bound by the agreement that disallowed any discussion about these reprehensible acts.

*10) Further Contemporaneous Corroboration*

60.    At the time of these events, Plaintiff De La Huerta was also the writer, director, producer and lead actress of her still unreleased film "*Valley of Tears*" which is a retelling of Hans Christian Anderson's "*Red Shoes*" which she had previously begun filming. At this time in early 2011, De La Huerta added a scene to *Valley of Tears* in which she is raped, and directed the filming of said scene in April of 2011, in order to show this from a woman's perspective and to attempt to use her cinematic art to work through the emotional trauma of Weinstein's assaults.

*11)  Interview in 2014 Disclosing Rapes and Four Seasons Events Wherein Plaintiff Was Too Fearful to File a Complaint*

61.    Plaintiff, who benefits at all times from an eidetic memory,  provided a detailed disclosure of the assaults by Weinstein, the fact that he threatened career harm if she did not submit and all details pled herein, including the role of the Four Season's concierge in directing her to Weinstein's room at the Four Seasons. At the time of the interview, she states that she is afraid of harm that will come to her if Harvey Weinstein is named as the assailant. She additionally states that although she has heard rumors, she does not know of any other woman that has been assaulted by Weinstein.

62.    This tape additionally shows that these events were not invented after the New York Times October 2017 article by Jodi Kantor, but were related exactly by the Plaintiff within the period of the Statute of Limitations for such sexual assaults under New York law, which may be applicable to this California action.  They further show that Plaintiff continued to be in fear because of threats made directly to her by Harvey Weinstein at the time of the events complained of herein. She

63.     De La Huerta was specifically threatened and expressed these fears against acting to report and sue for her harms during the period of statute of limitations when she related these events in her 2014 interview, meeting the requirements for equitable estoppel as set forth by the California Supreme Court in *John R. v Oakland Unified School District*, 48 Cal.3d 438 (1989):

> In deciding whether a public entity should be estopped from relying on a claims statute, we have identified four elements that must be shown for estoppel to arise: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury."

*John R*. at *455. Here, Weinstein was well aware of what had taken place, he intended to prevent public release of the information or a lawsuit, De La Huerta reasonably believed the threats of career harm were real and did not know there were large numbers of other victims who might come forward to denounce Weinstein in the future, and De La Huerta did rely on the warning as guidance and thereby suffered injury to her cause of action.

### *12). Culpability of Weinstein Director Robert Weinstein*

64.     The Weinstein Company has benefitted from the involvement of Harvey Weinstein and its Directors have knowingly acquiesced to a series of confidential settlements of sexual assault allegations on his behalf so that Harvey Weinstein serial acts of sexual predation are well known to them. The allegations in *Sandeep Rehal v. Harvey Weinstein, et al, Southern District of New York* 1:18-cv-00674 and subsequent New York State Supreme Court actions by Rehal an employee of The Weinstein Company, provide details of her duties in helping to arrange sexual encounters with Weinstein, stocking and providing Caverject injections to enable Weinstein to have necessary erections to perform his assaults, and cleaning up semen and condoms as part of her duties in addition to constant verbal harassment and unwanted vulgar touching as she performed her regular work duties. Because this activity involved numerous employees and continued over years, a director will be charged with some oversight and knowledge, particularly because the offensive behavior arises from the CEO – Harvey Weinstein – wherein it is specifically the duty of the Directors to be aware of and constrain the wrongful behavior of a CEO that places a corporation at risk. Dereliction of duty by a Director

-30-

such as Robert Weinstein, enables an executive to destroy hundreds of millions of dollars of investors' funds and to leave behind a bankrupt entity that extracted hundreds of millions of profits from the work of various performers and directors and producers but then collapsed leaving these individuals unpaid with little recourse among 10,000 creditors of the corpse of The Weinstein Company with over a hundred assaults victims engaged in legal actions against the estate of said bankrupt company.

65.     In addition, as allegations in *The People of the State of New York v. The Weinstein Company LLC* (see a copy attached in *Noble v. Weinstein* 1:17-cv-09260 as document 48-1 (Exh A) provide detail of threats by Weinstein including threats to murder employees and their families (see 1:17-cv-09260-RWS, Dkt# 48-1, page 11 and 12), quid pro quo harassment, recurrent sexual assaults and other behavior that has led the Attorney General of the State of New York to charge the Directors of the Weinstein Company with "Failure of Corporate Oversight" (see 1:17-cv-09260-RWS, Dkt# 48-1, page 28.)

66.     Unlike other directors Robert Weinstein, the brother of Harvey Weinstein is substantially known to be well aware of his brother's predatory activity. He co-founded Miramax with Harvey in 1979 and participated in the sale of Miramax to Disney in 1993. Public statements by Kathy Declisis – Robert Weinstein's assistant at Miramax, provide strong support to the expectation that Robert Weinstein's knowledge of Harvey's sexual misdeeds will be confirmed by admissible evidence upon deposition and testimony at trial. Robert Weinstein personally paid £250,000 to settle claims asserting that Harvey Weinstein had sexually assaulted a female employee. Robert Weinstein retained a strong financial motive to protect the secrecy of Harvey Weinstein's sexual misbehavior in order to personally benefit from the financial success of Miramax and later The Weinstein Company. The motivation of Robert Weinstein is confirmed by the spectacular collapse destroying $500 million of shareholder value, bankrupting the company and subject the directors to multiple litigations once his brothers' activities became well known.

67.     The Board of Directors, including Robert Weinstein could not help but understand why Harvey Weinstein wanted to them to sign a lease in a residential building a few blocks

from the SOHO headquarters when there were numerous hotels surrounding the headquarters. This is particularly so because the company had to provision and maintain the apartment when young actresses were directed to stay at the residence. Employees of Miramax and on information and belief The Weinstein Co were deployed as well as other subcontractors to clean maintain and provision the apartment, over years, on an intermittent basis, when individual actresses were scheduled to be directed to the accommodation. The money for the lease at 311 Greenwich was paid to the family of Paz De La Huerta for a space next to the bedroom of the young actress. Knowing the proclivities of his brother, and serving as a Director of the Company and as the employer of Paz De La Huerta during Cider House Rules, Robert Weinstein owed a duty of care to De La Huerta's family to warn them of Harvey's proclivities. Through this arrangement, paralleling ancient despised traditions in other cultures, Harvey's business paid money to De La Huerta's family, tracked her as she grew, offered her work and he then later raped her when she came of age.

68.    Plaintiff asserts an extension of the Statute of Limitations for this continuing wrong under the Child Victims Act NY CPLR 208(b).

### 13) Multiple United States District Court Judges Have Recently Ruled that the Trafficking Victims Protection Act is Applicable to Weinstein's Actions

69.    In all of the above, Defendants Harvey Weinstein, Robert Weinstein – at least in his capacity as a Director of The Weinstein Company, Four Seasons LTD and Burton Way are all subject to causes of action under the Trafficking Victims Protection Act 18 USC § 1591 and §1595 in the sense found by Hon. Robert W. Sweet, in *Kadian Noble v. Harvey Weinstein, et al.*, 335 F.Supp.3d 504 (2018), New York Southern District, 1:17-cv-09260-RWS, Docket #84 Order Denying Motion to Dismiss (See Exhibit B), also see  – Hon. Stephen V. Wilson in *Huett v. The Weinstein Company LLC*, California Central District, 2:18-cv-06012-SVW-MRW, Docket # 39, Order Denying Defendant's Motion to Dismiss, November 5, 2018 (see Exhibit C); and Hon. Paul A. Engelmayer in *Canosa v. Ziff et al*, New York Southern District, 1:18-cv-

-32-

04115-PAE, Docket # 152, Order Denying Motion to Dismiss, January 28, 2019 (see Exhibit D).

70.     Recently,  Harvey Weinstein has argued that the Sex Trafficking Act is not applicable to his actions in substantial part because he did not give anything of financial value to any of the women accusing him of sexual improprieties, so that a direct commercial transfer to support a charge of trafficking cannot be established (see Defendant Harvey Weinstein's Reply I support of his Motion to Dismiss in SD-Cal 1:18-cv-05414-RA *Wedil David v. The Weinstein Company*, et al, August 19, 2019 (Exh. E). In this matter, however, Miramax paid tens of thousands of dollars to the family of Ms. De La Huerta, establishing a sense of gratitude and obligation as the young actress was drawn into Harvey Weinstein's business as well as his predations.

*14) Respondeat Superior Establishes Liability for Disney and Miramax for the Assaults and for the Subsequent Alleged Actions of Harvey Weinstein to Cause De La Huerta's Employers at HBO and Lionsgate to Terminate Her Employment*

71.     In California, Respondeat Superior exists even in an intentional criminal tort, if the tort arises from events related to the employment. Here, both Harvey Weinstein's awareness of young Paz De La Huerta from his presence at the Miramax rental at 311 Greenwich and the furtherance of his obsession with her that commenced during filming of Cider House Rules bring the rape into a respondeat superior issue under *Lisa M v. Henry Mayo Newhall* 12 Cal.4th 291 (1995) citing to *Carr v. Wm. Crowell Co*. 28 Cal.2d 652, 654 (1946).

72.     It is clear that the risk of sexual assault by Harvey Weinstein is inherent in the working environment fostered at Miramax meeting the condition of *Carr*. De La Huerta and her family were aware of and anxious about these risks at the time of the undertaking to allow Paz De La Huerta to participate in the making of the Cider House Rules film. Thus, unlike the individual case in *Lisa M*, sexual assault was an expectable aspect of employment of actress by Harvey Weinstein. The motivating emotions of Harvey Weinstein were fairly attributable to the work conditions of his controlling the work and hiring of young female actresses while imbuing

-33-

all aspects of the work with a sense of likelihood or expectability of intimate sexual contact.
Thus, although Weinstein was no longer CEO of Miramax, the wrong arose from the bringing
together of these two individuals in the course of business of Miramax. For this reason, The
Walt Disney Company and Miramax have respondeat superior liability for the assaults and for
the loss of income through her termination of high value multi-year projects with HBO and
Lionsgate.

73.    Additionally, both Harvey Weinstein and Paz De La Huerta were W-2 employees
of both Disney and Miramax at the time of the assault in 2010. This is because both continued to
receive residuals on W-2's from both Miramax and Disney (see attached statement, Exh F).

74.    This action will fall under 18 USC §1591, and money paid by Miramax in the
lease will be relevant. The action is therefore timely filed and both Miramax and Disney are
liable along with the other named defendants. Worker's Compensation will not apply because of
the intentionality and inherent ratification.


## IV. FIRST CAUSE OF ACTION - ASSAULT

**(As against HARVEY WEINSTEIN, MIRAMAX And THE WALDISNEY COMPANY)**

75.    Plaintiff realleges and incorporates by reference as though fully set forth herein,
each and every allegation set forth above in this Complaint.

76.    Defendant Harvey Weinstein intended to cause a harmful and offensive act with
Plaintiff when, just inside the door of a hotel room in Los Angeles, California he indecently
exposed his penis to Plaintiff on or around January 16, 2011 thereby performing an act that
would offend a reasonable sense of personal dignity.

77.    Plaintiff reasonably believed that she was about to be touched by Defendant in a
harmful and offensive manner given the previous occurrences of Defendant forcing himself on
Plaintiff thereby performing an unconsented act of sexual intercourse at two separate prior
incidents.

78.    Plaintiff did not consent to the indecent exposure of Defendant's penis.

79.     Defendant's conduct of indecent exposure was a substantial factor in causing Plaintiff's severe harm.

## V. SECOND CAUSE OF ACTION – SEXUAL BATTERY

### (as against MIRAMAX And THE WALDISNEY COMPANY)

80.     Plaintiff realleges and incorporates by reference as though fully set forth herein, each and every allegation set forth above in this Complaint. As a first separate and distinct claim for relief, Plaintiff complains against Defendant as follows:

81.     California Civil Code §1708.5 provides as follows:

(a) A person commits a sexual battery who does any of the following:

    (1) Acts with the intent to cause a harmful or offensive contact with an intimate part of another and a sexually offensive contact with that person directly or indirectly results.

    (2) Acts to cause a harmful or offensive contact with another by use of his or her intimate part, and a sexually offensive contact with that person directly or indirectly results.

    (3) Acts to cause an imminent apprehension of the conduct described in paragraph (1) or (2), and a sexually offensive contact with that person directly or indirectly results.

(b) A person who commits a sexual battery upon another is liable to that person for damages, including, but not limited to, general damages, special damages, and punitive damages.

(c) The court in an action pursuant to this section may award equitable relief, including, but not limited to, an injunction, costs, and any other relief the court deems proper.

(d) For the purposes of this section "intimate part" means the sexual organ, anus, groin, or buttocks of any person, or the breast of a female.

(e) The rights and remedies provided in this section are in addition to any other rights and remedies provided by law.

(f) For purses of this section "offensive contact" means contact that offends a reasonable sense of personal dignity.

82.     Plaintiff alleges that Defendant committed the act of civil sexual battery in violation of <u>California Civil Code §1708.5</u>, when, on or around December 7, 2010 and on or around December 23rd, 2010, Defendant Weinstein willfully, maliciously, intentionally and without the consent of Plaintiff subjected her to forceful, harmful and offensive touching of Plaintiff's body, including viciously raping Plaintiff by way of vaginal penetration, against her will, without her consent, and in spite of her express objection.

83.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, all in an amount according to proof at trial.

84.     As a direct and proximate result of Defendants unlawful conduct, Plaintiff has suffered economic harm and other consequential damages all in an amount according to proof at trial.

85.     The acts of Defendant, as alleged herein were willful, wanton, and malicious and were intended to oppress and cause injury to Plaintiff. In light of the willful, wanton, malicious and intentional conduct engaged in by Defendant, Plaintiff is entitled to an award of punitive damages.

86.     Plaintiff alleges comparable acts under New York CPLR §213-c. Plaintiff further alleges that under New York CPLR §215(8) that the statute of limitations will additionally be governed by the completion of New York Supreme Court case #02335-2018. The making of a criminal complaint by Paz De La Huerta was a key initial event in the commencement of this case. Additional indictments have been proposed in this matter within the last four weeks.

## VI. THIRD CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(Intentional Infliction of Emotional Distress as against ALL Defendants)**

87.     Plaintiff realleges and incorporates by reference as though fully set forth herein, each and every allegation set forth above in this Complaint.

88.     This is an action for damages pursuant to the common law of the State of California as mandated by the California Supreme Court in the decision of _Rojo v. Kliger_ 52 Cal. 3d 65 (1990).

89.     Defendant engaged in the extreme and outrageous conduct herein above alleged with wanton and reckless disregard of the probability of causing Plaintiff to suffer severe emotional distress.

90.     As a proximate result of the extreme and outrageous conduct engaged in by defendant, Plaintiff suffered severe emotional distress, humiliation, mental anguish and extreme emotional and physical distress all to her general damage in an amount according to proof at trial.

91.     As a proximate result of the wrongful actions of the Defendant, Plaintiff has suffered harm, including but not limited to, lost earnings and other employment benefits, loss of future employment benefits, humiliation, and emotional distress all in an amount to be proved at trial but exceeding the minimum jurisdiction limits of this court.

92.     The conduct of the Defendant in assault and sexual battery that gave Defendant the real or apparent power to affect the Plaintiff who was particularly vulnerable to emotional distress and that his conduct would likely result in harm due to mental distress.

93.     The Defendant intended to cause the Plaintiff emotional distress.

94.     The Defendant acted with reckless disregard of the probability that the Plaintiff would suffer emotional distress, knowing that the Plaintiff was present when the conduct occurred, and it was intended towards Plaintiff.

95.     The Plaintiff subsequently suffered severe emotional distress that was substantial, and that no reasonable person in a civilized society should be expected to bear, including but not

limited to suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame.

96.     The conduct of Defendant was a substantial factor in causing the Plaintiff's severe emotional distress.

## VII. FOURTH CAUSE OF ACTION – NEGLIGENT SUPERVISION

## (As Against ROBERT WEINSTEIN, MICHAEL EISNER, ROBERT IGER, MIRAMAX And THE WALT DISNEY COMPANY)

97.     Plaintiff realleges and incorporates by reference as though fully set forth herein, each and every allegation set forth above in this Complaint.

98.     At all times material, TWC employed Harvey Weinstein and Harvey Weinstein was an executive and/or director of TWC.

99.     Harvey Weinstein, Robert Weinstein as a Director Defendant, as well as Michael Eisner and Robert Iger as Officers, were in an employee-employer relationship. The Board of Directors does not have a role of day to day supervision of employees generally, however it is specifically the duty of the Board of Directors to supervise senior officers, with no duty more critical than the duty to supervise the CEO.

100.     At the time of the time of the acts alleged herein there was an actual or assumed agency relationship between Harvey Weinstein and the Director Defendants.

101.     Harvey Weinstein's conduct as alleged herein was committed in the scope and furtherance of his employment for the Director Defendants.

102.     All acts or omissions alleged herein were ratified by the Director Defendants. The Director Defendants had actual or constructive knowledge of specific prior acts or allegations that made Harvey Weinstein's wrongful conduct complained of herein foreseeable.

103.     No meaningful disciplinary action was taken and Harvey Weinstein was allowed to continue to use TWC resources and his position at TWC to facilitate his sexual misconduct.

104.     During all relevant times, Harvey Weinstein used physical force, intimidation, coercion and fraud to perform the sexual acts alleged herein.

105.    During all relevant times, the Director Defendants knew or should have known Harvey Weinstein used physical force, intimidation, coercion and fraud to perform the sexual acts alleged herein which would cause a reasonably prudent person to investigate his capacity as an employee and to terminate said employee's employment.

106.    The Director Defendants were aware of the pervasive perception in the entertainment industry that Harvey Weinstein used force and intimidation and coercion to asexually assault women.

107.    For example, the comment of Courtney Love cited above at paragraph 21 – indicating that Harvey Weinstein was known to utilize the Four Seasons Hotel Los Angeles as a location for serial assaults and acts of humiliation toward female professionals in the film industry.

108.    Based on his long history of misconduct, Director Defendants knew or should have known that Harvey Weinstein was unfit or incompetent to work with Plaintiff.

109.    The Director Defendants failed to use reasonable care to discipline or remove Harvey Weinstein.

110.    The Director Defendants conduct and omissions were a direct and proximate cause of Plaintiff's injuries.

111.    The Director Defendants could reasonably have anticipated that Harvey Weinstein's conduct complained on herein would be likely to result in injury to others.

112.    The Director Defendants should have known of Harvey Weinstein's conduct which caused the injuries, assaults, and other misconduct of Harvey Weinstein complained of herein, prior to same occurring.

113.    The injuries, assaults, and other misconduct of Harvey Weinstein complained of herein, were committed with the chattels of the Director Defendants.

114.    The Director Defendants knew or should have known TWC failed to implement an adequate hiring, retention and/or discipline policies.

115.    The Director Defendants knew or should have known TWC negligently trained and/ or supervised Harvey Weinstein in his management position.

116.   TWC breached its duty to provide effective sexual harassment and anti-retaliation policies and procedures.

117.   At the time of the illegal conduct that caused plaintiff to suffer permanent injuries, Harvey Weinstein was acting in the course of his business and/ or job duties for TWC.

118.   Harvey Weinstein's misconduct as alleged herein was previously known to Director Defendants, which facilitated his unlawful, abusive and predatory sexual misconduct by, among other things using TWC employees to lure victims to private meetings while taking steps to hide his misconduct and silence victims.

119.   As a result, Plaintiff has suffered lost earnings, loss of future employment benefits, humiliation, emotional pain and suffering, physical pain, emotional distress, pain and suffering and loss of enjoyment of life, and claims compensatory and punitive damages herein.

120.   Plaintiff alleges that Defendant TWC is responsible for the acts of Weinstein because TWC hired and supervised Weinstein and Weinstein was acting as the agent of TWC when he committed the acts and conduct alleged herein.

121.   Upon information and belief, TWC knew or should have known that Harvey Weinstein was unfit and that his unfitness created a particular risk to others. TWC's Board of Directors including Robert Weinstein possessed knowledge of Weinstein's propensity to engage in sexual misconduct during the course of his employment under the supervision of TWC. The Board of Directors of TWC including Robert Weinstein, at all relevant times, maintained a supervisory position over Weinstein.

122.   Upon such information and belief Plaintiff alleges that Weinstein's unfitness harmed the Plaintiff by resulting in unconsented to sexual advances, indecent exposure, and rape.

123.   TWC's negligence in supervision and retention of Weinstein as an employee of the company was a substantial factor in causing Plaintiff's harm. By failing to terminate Weinstein upon the first time of learning of Weinstein's criminal acts, TWC was the substantial factor allowing Weinstein's acts to continue without repercussions.

1

2

3  ## VIII. FIFTH CAUSE OF ACTION – PREMISES LIABILITY NEGLIGENCE

4  ### (as Against Defendants The Four Seasons, and Burton Way)

5     124.    Plaintiff realleges and incorporates by reference as though fully set forth herein,

6  each and every allegation set forth above in this Complaint.

7     125.    Plaintiff is informed and believes and so therefore does allege, that BURTON

8  WAY and FOUR SEASONS LTD owned, managed, leased or controlled the FOUR SEASONS

9  BEVERLY HILLS and rented out rooms to THE WEINSTEIN COMPANY at lease one of

10 which was occupied from time to time by HARVEY WEINSTEIN.

11    126.    Plaintiff is informed and believes and so therefore does allege that DEFENDANTS

12 BURTON WAY, FOUR SEASONS LTD and THE WEINSTEIN COMPANY were negligent

13 in the use of the FOUR SEASONS LOS ANGELES AT BEVERLY HILLS in that they had a

14 duty to use reasonable care to protect their patrons and guests from another person's criminal

15 conduct on its property to which they could reasonably anticipate the conduct. They are required

16 to take steps to protect persons such as PAZ DE LA HUERTA by  warning of conditions they

17 knew to exist, that pose a danger of harm to patrons and guests and invitees.

18    127.    Defendants BURTON WAYS, FOUR SEASONS LTD, THE WEINSTEIN

19 COMPANY demonstrated severe malice through their disregard for the harm and humiliation of

20 multiple women over multiple years. Choosing profits over their responsibilities as innkeepers

21 and business persons, even participating and knowingly aiding HARVEY WEINSTEIN in his

22 actions. They equally demonstrated severe oppression in their reckless disregard for the harms

23 and humiliations being inflicted on their guests, visitor and invitees. For these reasons, these

24 Defendants, and each of them should be subject to an award of punitive damages.

25    128.    Plaintiff is informed and believes and so therefore does allege that Paz De La

26 Huerta was harmed at the FOUR SEASONS LOS ANGELES AT BEVERLY HILLS and that

27 neglegince on the part of BURTON WAYS, FOUR SEASONS LTD, THE WEINSTEIN

28 COMPANY and each of them was a substantial factor in causing DE LA HUERTA's harm.

These entities were aware that Harvey Weinstein habitually used the FOUR SEASONS LOS ANGELES AT BEVERLY HILLS to engage in the sexual assault and sexual humiliation of women. The FOUR SEASONS LOS ANGELES AT BEVERLY HILLS anticipated the conduct of HARVEY WEINSTEIN by his use of the concierge staff to invite and direct women to HARVEY WEINSTEINS's rented room at the hotel where they could reasonably anticipate that he was to engage in rape, molestation, sexual assault and sexual humiliation of various women on a habitual basis. The FOUR SEASONS LOS ANGELES AT BEVERLY HILLS knew that others, such as Courtney Love had taken on a personal risk of being sued for attempting to warn women who were potential guests at the FOUR SEASONS LOS ANGELES AT BEVERLY HILLS, yet these owners, managers, and lessors made no adequate and reasonable efforts themselves to investigate, to warn, and to prevent the commission of additional, such rapes, assaults and humiliation.

**SIXTH CAUSE OF ACTION  COUNT I - VIOLATION OF 18 U.S.C. §1591**

*(Against HARVEY WEINSTEIN, MIRAMAX and THE WALT DISNEY COMPANY)*

129.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 79 above.

130.   Harvey Weinstein, as he had done on many occasions, engaged in interstate travel for TWC business, and engaged in electronic communications in interstate commerce to arrange a meeting with Plaintiff, where he promised her participation and a role in an entertainment project.

131.   Harvey Weinstein met with Plaintiff in Los Angeles, had her directed up to his hotel room by a Four Seasons Hotel Concierge, under a false and fraudulent pretense of provide her participation and a role in an entertainment project which he had previously offered to her in relation to a sexual assault in New York.

132.   Harvey Weinstein knew that he would use fraud, physical force or coercion (as he had done many times before to many other young actresses) on Plaintiff for a sexual encounter.

-42-

He offered her an entertainment project role, and demanded sexual contact despite the fact that Plaintiff said "no".

133.    Harvey Weinstein was well aware that a role in one of TWC's projects, or the exercise of his influence on her behalf in the entertainment business, was of significant commercial value to Plaintiff, and Harvey Weinstein used such promise regarding a television project and the prospective use of his influence on her behalf, to recruit and entice Plaintiff to his hotel room where he intended to coerce sex acts.

134.    Harvey Weinstein's offer of a role in an entertainment project, together with threats of harm to her existing career if she did not comply or if he revealed the prior acts of sexual domination, and the offer to use his influence on her behalf, was used to gain access to her apartment in New York and then to entice her to his Four Seasons hotel room in Los Angeles. Harvey Weinstein then  physically and violently coerced Plaintiff into sexual acts in New York, having gained access to her apartment. He crudely propositioned her in Los Angeles and made additional threats which Plaintiff then rejected, after luring her to his room on the pretense of making good on the offer of entertainment industry acting work in compensation for his sexual predation in New York. This was a typical practice of Harvey Weinstein, as it was common for him to lure young females into his room with the promise of an attractive role or entertainment project, and then coerce them into a sexual encounter. Harvey Weinstein knew that the promise of a role or the use of his influence on her behalf would entice Plaintiff, and knew that he was in a position to coerce the sexual activity he desired and to intimidate her into silence if she refused.

135.    Harvey Weinstein was able to coerce Plaintiff into allowing him in to her apartment for a pretense of a business discussion, but upon gaining entry on that pretense then engaged in a violent sexual assault. He then made an offer of an acting role, which he then used – in balance with threats to destroy her existing career -   to gain access to her apartment a second time. He then used these without success in Los Angeles whereupon Plaintiff rebuffed him and denounced him. Weinstein then carried out his threats, while Plaintiff remained in fear of further harm if she reported these events.

-43-

136.    Harvey Weinstein in this case used the ploy of an acting role as a fraudulent means of obtaining sexual gratification from Plaintiff.

## SIXTH CAUSE OF ACTION  COUNT II - PARTICIPATING IN A VENTURE IN VIOLATION OF 18 U.S.C. §1591

### (Against FOUR SEASONS LTD, and BURTON WAY)

137.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 87 above.

138.    Four Seasons LTD and Burton Way knowingly participated in Harvey Weinstein's venture in violation of 18 U.S.C. §1591 by benefiting from, and knowingly facilitating, the venture in which Harvey Weinstein traveled in interstate commerce, and used the means of interstate commerce, to recruit or entice female actors into forced or coerced sexual encounters on the promise of attractive role in entertainment projects.

139.    Four Seasons LTD and Burton Way knew, or were in reckless disregard of the facts, that it was the practice of Harvey Weinstein to travel in interstate commerce or use the means of interstate commerce to entice or recruit female actors into defrauded, forced or coerced sexual acts based on the promise of participation in upcoming entertainment projects or the use of his influence in their favor.

140.    Four Seasons LTD and Burton Way had been privy to public warnings relating to their own hotel property where he stayed annually and engaged in sexual trafficking and predations. Such acts were well known to Four Seasons LTD and Burton Way, prior to January, 2011.

141.    Despite such knowledge, Four Seasons LTD and Burton Way continued to facilitate and benefit from these activities of Harvey Weinstein which he engaged in during the course of his annual presence at Four Seasons Hotel Los Angeles at Beverly Hills ("FSH-LABH") for the Awards Season, holding court as if an in the same fashion as if said Four Seasons were an additional business place of The Weinstein Company, but fitted with bedrooms and jacuzzis. Further, Four Seasons LTD and Burton Way executives and employees knowingly aided the commercial sex acts by engaging in contacts and communications with the female

-44-

actors recruited by Harvey Weinstein such as by passing along invitations to his room in the act by the Concierge in this matter despite common knowledge of the risks to Four Seasons Hotel's guests.

142. Upon information and belief, the code word among Four Seasons LTD and Burton Way employees "FOH" meant "Friend of Harvey", and referred to a young woman who had participated in sex in exchange for a role or position in an upcoming project. Four Seasons LTD and Burton Way employees knew to "take care" of the FOH's.

143. Four Seasons LTD and Burton Way, and their executives and employees, benefitted from the venture. Upon information and belief, in exchange for facilitating and covering up Harvey Weinstein's commercial sex acts, the Four Seasons LTD and Burton Way executives and employees progressed in their careers at Four Seasons LTD and Burton Way and received financial benefits while generating large profits and intensive world-wide media attention for the hotel during each Awards Season. The value of this marketing and its effect upon the whole entertainment industry in Los Angeles and internationally was of enormous financial value to Four Seasons LTD and Burton Way. Upon information and belief, participating and covering up Harvey Weinstein's scheme was a means of obtaining success and growth within Four Seasons LTD and Burton Way. In other words, those who participated in the scheme received better assignments and compensation.

144. Four Seasons LTD and Burton Way knowingly benefitted financially from the commercial sex act venture of Harvey Weinstein, including the profits from the hotel room and event and catering sales and very large profits resulting from the intensive world-wide publicity for the hotel across virtually every newspaper, television news show and entertainment news-oriented website in the world as well as conventional media such as the New York Times. By facilitating Harvey Weinstein's commercial sex acts in interstate commerce, Four Seasons LTD and Burton Way enjoyed the promotion and promulgation of incalculable value.

## IX. DAMAGES

145.     On information and belief, the financial harm of being terminated off of Boardwalk Empire constituted a loss of income and loss of future work valued at $5 million. The termination occurred while De La Huerta was receiving wide spread acclaim for her role in that series. Whether the termination was a result of a retaliatory act by WEINSTEIN or whether the termination was due to psychological damage and deterioration suffered and publicly demonstrated by De La Huerta commencing in January of 2011 in consequence of the interaction with Weinstein, these constitute a basis for determining the value of damages from suffered by De La Huerta through the actions of these DEFENDANTS.

146.     In addition, although De La Huerta was injured on the set of "Nurse" – a Lionsgate production – in 2011, California courts found that the subsequent substantial collapse of her film career was not due to the Lionsgate injury. Therefore, De La Huerta will look to WEINSTEIN for the substantial cause of these career harms which she has valued at $55 million in her action against Lionsgate.

## X. CONCLUSION

147.          For the reasons set forth above, Plaintiff seeks a finding of liability against HARVEY WEINSTEIN, ROBERT WEINSTEIN, MIRAMAX, THE WALT DISNEY COMPANY, MICHAEL D. EISNER, ROBERT A. IGER, BURTON WAY and FOUR SEASONS HOTELS and seeks damages in amount subject to proof at trial.

## XI. PRAYER FOR RELIEF

148.     General damages in an amount to be shown according to proof at the time of trial.

149.     Special damage including medical and psychological care expenses in an amount to be shown according to proof at the time of trial.

150.     Punitive and exemplary damages in an amount appropriate to punish or set an example of Defendant.

PAZ DE LA HUERTA'S COMPLAINT FOR SEX TRAFFICKING ASSAULT AND NEGLIGENCE vs WEINSTEIN ET AL

1    151.    Cost of Suit.

2    152.    Such other and further relief as this court deems just and proper.

3

4

5                        **DEMAND FOR JURY TRIAL**

6        Plaintiff hereby demands a jury trial in this action.

7    Date:    August 27, 2019

8                                    AARON G. FILLER, MD, PhD, FRCS JD

9

10

11       By:

12       _____
                          Aaron Filler, Esq.

13                        TENSOR LAW PC
                         Aaron G. Filler, Esq.
14                        Alex R. Straus, Esq.
                         Chanel Katiraie, Esq.
15                        TENSOR LAW PC
                         2716 Ocean Park Blvd, Suite 1060
16                        Santa Monica, CA 90405
                         Phone: (310) 450-9689
17                        Fax: (310) 496-3176
                         afiller@tensorlaw.com
18                        Attorneys for Plaintiff, Paz De La Huerta

19

20

21

22

23

24

25

26

27

28

                                    -47-

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 2716 Ocean Park Blvd, #3082, Santa Monica, CA 90405.

On August 27, 2019 I served the foregoing document(s) described as
**PAZ DE LA HUERTA'S COMPLAINT FOR ASSAULT AND NEGLIGENCE vs WEINSTEIN ET AL**

on interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

SEE ATTACHED SERVICE LIST

☐    **(BY MAIL)** I deposited such envelope(s) in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒    **(BY OVERNIGHT DELIVERY)** I placed said documents in envelope(s) for collection following ordinary business practices, at the business offices of TENSOR LAW, P.C., and addressed as shown on the attached service list, for collection and delivery to a courier authorized by _FEDERAL EXPRESS to receive said documents, with delivery fees provided for. I am readily familiar with the practices of TENSOR LAW P.C., for collection and processing of documents for overnight delivery, and said envelope(s) will be deposited for receipt by FEDERAL EXPRESS on said date in the ordinary course of business as to parties not ECF-registered.

☒    **(BY THE COURT'S ECF SYSTEM)** I caused each such document(s) to be transmitted electronically by posting such document electronically to the eFile website of the Los Angeles Superior Court - registered parties in the action.

☐    **(BY PERSONAL SERVICE)** I delivered such envelope(s) by hand to the offices of the addressee(s).

☒    (State)    I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct.

☐    (Federal)   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

Executed on August 27, 2019 at Santa Monica, California

Jodean Petersen
_____

Type or Print Name

_____
Signature

-48-

PAZ DE LA HUERTA'S COMPLAINT FOR SEX TRAFFICKING ASSAULT AND NEGLIGENCE vs WEINSTEIN ET AL

1
2
3
4
5
6
7

PAZ DE LA HUERTA v. HARVEY WEINSTEIN, ET AL

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

SERVICE LIST

| | |
|---|---|
| **Phyllis Kupferstein**<br>Kupferstein Manuel LLP<br>865 South Figueroa Street, Suite 3338<br>Los Angeles, CA 90017<br>(213)-988-7531  Fax: (213)-988-7532<br>Email: pk@kupfersteinmanuel.com | Defendant:<br><br>HARVEY WEINSTEIN |
| **Elior Daniel Shiloh**<br>Lewis Brisbois Bisgaard & Smith LLP<br>77 Water Street, Suite 2100<br>New York, NY 10005<br>212-232-1300  Fax: 212-232-1399<br>Email: elior.shiloh@lewisbrisbois.com | Defendant:<br><br>HARVEY WEINSTEIN |
| **Marvin S. Putnam**<br>Latham & Watkins LLP (LA)<br>355 South Grand Avenue<br>Los Angeles, CA 90071<br>(424)-653-5588<br>Email: marvin.putnam@lw.com | Defendant:<br><br>MIRAMAX FILMS NY LLC |
| **Evan R Chesler**<br>Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, NY 10019<br>(212) 474-1000 Fax: (212) 474-3700<br>Email: echesler@cravath.com | Defendant:<br><br>THE WALT DISNEY<br>COMPANY |
| **Evan R Chesler**<br>Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, NY 10019<br>(212) 474-1000 Fax: (212) 474-3700<br>Email: echesler@cravath.com | Defendant:<br><br>MICHAEL D. EISNER |

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-49-

| | |
|---|---|
| **Evan R Chesler**<br>Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, NY 10019<br>(212) 474-1000 Fax: (212) 474-3700<br>Email: echesler@cravath.com | Defendant:<br><br>ROBERT A. IGER |
| **Gary Stein**<br>Schulte Roth & Zabel LLP (NY)<br>919 Third Avenue<br>New York, NY 10022<br>(212) 756-2441  Fax: (212) 593-5955<br>Email: gary.stein@srz.com | Defendant:<br><br>ROBERT WEINSTEIN |
| Carol Baidas, Esq.<br>Philip K. Schrieffer, Esq.<br>P.K. SCHRIEFFER LLP<br>100 North Barranca Street, Suite 1100<br>West Covina, CA 91791<br>Phone: (626) 373-2444<br>Facsimile: (626) 974-8403<br>*pks@pksllp.com*<br>*cab@pksllp.com* | Attorneys for Defendants:<br><br>THE FOUR SEASONS HOTELS<br>LTD<br>BURTON WAY HOTELS LTD<br>BURTON WAY HOTELS LLC |

/S/ Aaron G. Filler